IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00818-NRN

JEREMY LAWHON,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

Entered by Magistrate Judge N. Reid Neureiter

This case is before the Court for all purposes pursuant to 28 U.S.C. § 636(c), upon the consent of the parties (Dkt. #14) and the Order of Reference entered by Chief Judge Marcia S. Krieger on June 12, 2018 (Dkt. #15). This is a negligence case, brought against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671, and 2680 (FTCA), by Jeremy Lawhon. Mr. Lawhon claims that the driver of a Bureau of Prisons passenger van acted negligently in making a U-turn in front of Lawhon, without seeing him, causing him to crash into the side of the van on his motorcycle.

The Court held a three-day bench trial on August 7-9, 2019. At trial, the parties presented argument and evidence, including the testimony of the Plaintiff Lawhon, the investigating Aurora Police Officer, three medical providers, and Bureau of Prisons (BOP) employee Tracy Kohoano (the allegedly negligent driver), as well as exhibits in support of their positions. At the conclusion of the trial, this Court announced certain

1

findings of fact, and took other issues of law and fact under advisement. The Court now enters its Findings of Fact, Conclusions of Law and Order.

I. **FINDINGS OF FACT**

1. This case arises out of a motorcycle accident that occurred on East 30th Street in Denver near Peoria Street on August 18, 2016.

2. On that date, Mr. Lawhon was riding a 1998 Honda CBR 600 motorcycle east on 30th Street towards Peoria Street.

3. On May 11, 2016, Mr. Lawhon had entered into a written contract to buy the motorcycle from an acquaintance, Tyrra Bohannon. Pl's Exh 5. The written contract placed the value of the motorcycle at $1,200, although it was not in a running condition and needed new tires at the time the contract was signed.

4. Mr. Lawhon agreed to pay for the motorcycle by promising to do certain jobs and tasks for Mr. Bohannon. Mr. Bohannon transferred possession of the motorcycle to Mr. Lawhon.

5. Mr. Lawhon had prior experience and training as a mechanic and was capable of doing the work to put the motorcycle in running condition.

6. Mr. Lawhon had been riding motorcycles since he was young and previously had owned a number of motorcycles, including two Honda Goldwings and a Honda Interceptor. He also had years of experience riding dirt bikes.

7. Mr. Lawhon did not have a valid motorcycle endorsement on his license and had never taken a motorcycle safety course.

8. Just a few days before the accident, Mr. Lawhon had successfully gotten the CBR 600 motorcycle running and had also spent $250 on new tires. Mr. Lawhon

did some, but not all, of the tasks he had promised to do for Mr. Bohannon in exchange for the motorcycle.

9. At approximately 3:00 pm on August 18, 2016, Mr. Lawhon was riding the motorcycle home from a junkyard where he had gone to buy a part for a friend's car. Mr. Lawhon was traveling 25-30 mph east on East 30th Street when he saw approximately 450 feet ahead of him several large white BOP passenger vans. One of the vans appeared to Mr. Lawhon to be parking or trying to park.

10. As Mr. Lawhon approached the van from the rear, Mr. Lawhon tried to make eye contact with the driver of the van to ensure that she saw him. But she did not make eye contact and pulled out to do a U-turn across the east-bound lane of traffic and directly in front of Mr. Lawhon on the motorcycle. Mr. Lawhon applied the brakes hard and tried to avoid the collision but was unable to do so and crashed into the driver's side door of the B.O.P. van.

11. I find that Mr. Lawhon acted reasonably and was not at fault in causing the accident. He testified credibly as to what he saw and observed prior to the crash as well as his failed effort to avoid the collision. Mr. Lawhon's testimony regarding the specifics of the crash is generally corroborated by the testimony of the investigating Aurora Police Officer who was qualified as an accident reconstruction expert. Mr. Lawhon's testimony is also corroborated by the photographs of the scene, and the damage to both the motorcycle and the B.O.P. van.

12. The investigating Aurora Police Officer (trained in traffic accident reconstruction) estimated that the accident occurred at approximately 20 miles per hour. There is no evidence that Mr. Lawhon was speeding or riding recklessly.

13. The driver's side of the BOP van was dented from the crash.

14. The motorcycle was damaged and appeared to be leaking fluid.

15. Mr. Lawhon's body was thrown against the side of the van by the crash.

16. Mr. Lawhon, upset and shaken by the crash, jumped up and yelled at the driver of the van. He later sat down on the side of the street to wait for the emergency medical technicians who would transport him to University of Colorado Hospital on Colfax Avenue.

17. The van driver, Ms. Kohoano, testified that she checked her mirrors—rear and side—and tried to see if there was any traffic behind her before executing her U-turn. One of her passengers yelled out "Tracey" just before the impact. Ms. Kohoano may have looked, but she did not look carefully enough, and, as she admits, did not see Mr. Lawhon approaching. Had she seen Mr. Lawhon, she would not have made a u-turn directly into his path.

18. Under Colorado law, a driver must maintain a proper lookout to see what that driver could and should have seen in the exercise of reasonable care. Colo. Pattern Jury Instruction 11:1. I find that the van driver, Ms. Kohoano, was negligent in that she breached her duty to act reasonably with respect to other users of the public roadway. By attempting to make a U-turn without first confirming that the roadway was clear, she failed to maintain a proper lookout and did not see what should have been seen in the exercise of reasonable care, namely, Mr. Lawhon approaching from the west on his motorcycle.

19. Mr. Lawhon was transported to the hospital where he was examined and treated in the emergency room. Mr. Lawhon's treating emergency physician testified

4

that the tests (including multiple x-rays) were reasonable and necessary to properly evaluate an injured motorcyclist in a motorcycle-automobile accident. Mr. Lawhon had an injury to his hand, his shoulder, and general upper body soreness. The emergency department diagnosed a contusion. I do find that the medical services provided were reasonable and necessary.

20. The medical services provided in the UCHealth Emergency Department were valued at $28,765.53 in a document sent to Mr. Lawhon after the treatment.

21. Mr. Lawhon is covered by Medicaid and, by law, the hospital was not allowed to bill Mr. Lawhon directly for these charges. Mr. Lawhon did not pay the $28,765.53 medical bill and the evidence is not clear whether Medicaid paid the $28,765.53 medical bill (or any portion thereof).

22. Mr. Lawhon provided a urine sample for urinalysis while in the Emergency Department. This test came back positive for methamphetamine and negative for all other drugs. The United States asserted in opening argument that this positive result for methamphetamine would show that Mr. Lawhon was under the influence of methamphetamine at the time of the crash and that he should be held partially (or entirely) responsible for the accident. However, the treating emergency room physician explained that the specific methamphetamine urine test used that day is less reliable than tests for other drugs because a number of innocuous substances or medications (such allergy medicine) can result in false positives. Accordingly, with respect to methamphetamine, emergency room physicians are trained to look for clinical symptoms to support a finding of being under the influence. These symptoms include, among other things, tachycardia (elevated heart rate), high blood pressure, paranoia,

and picking at skin. According to the contemporaneous medical records and the physician's testimony, in the emergency room Mr. Lawhon exhibited none of the clinical symptoms of being under the influence of methamphetamine.

23. Mr. Lawhon also testified that he had not used methamphetamine in the months prior to the accident (although he admitted that he had previously used methamphetamine perhaps two years prior to the accident). I find Mr. Lawhon's testimony on the issue of alleged methamphetamine intoxication to be credible. His testimony is confirmed by the Emergency Department physician's clinical evaluation of Mr. Lawhon immediately post-crash. I do not find that Mr. Lawhon was under the influence of drugs at the time of the accident.

24. Mr. Lawhon testified that he experienced soft tissue pain in the days after the accident, and shoulder problems to the point where he could not lift his arm to do his work as a window washer.

25. Mr. Lawhon also experienced pain in his ankle, edema, and difficulty walking. He sought an appointment with a primary care provider, which took more than a month to obtain. He was then referred to a physical therapist for treatment.

26. The United States disputes whether Mr. Lawhon's ankle injury and treatment was caused by the motorcycle crash, pointing to the delay in seeking a primary care appointment. Mr. Lawhon testified that the ankle injury was a result of the motorcycle crash and I find him credible on this point. His testimony is confirmed by his contemporaneous reports to both the primary care physician and the physical therapist that his ankle injury was a result of the motorcycle crash. The United States presented no evidence to suggest the that Mr. Lawhon suffered some other trauma or incident that

could have caused the ankle injury, and the emergency room physician explained that soft-tissue injuries are not always apparent in the immediate aftermath of a crash, but may become more pronounced in the days after a crash or traumatic event. I therefore find by a preponderance of the evidence that Mr. Lawhon's ankle injury, for which he received treatment, was caused by the motorcycle crash.

27. I find for Mr. Lawhon in the issue of liability. I find by a preponderance of the evidence that Mr. Lawhon suffered damages from the crash as the result of Ms. Kohoano's negligence in failing to keep a proper lookout before executing a u-turn in the large B.O.P. passenger van.

## II. CONCLUSIONS OF LAW

The FTCA specifies that the United States shall be liable under the Act "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Because the accident occurred in Colorado, the right of recovery under the FTCA is determined by the substantive law of Colorado. *Haceesa v. United States,* 309 F.3d 722, 724 (10th Cir. 2002).

Mr. Lawhon seeks three categories of damages: economic losses, including medical expenses; non-economic losses; and damages for physical impairment. He must prove his entitlement to damages by a preponderance of the evidence. Mr. Lawhon must also show that his damages were caused by the collision with the BOP van on August 18, 2016. *McLaughlin v. BNSF Ry.CO*, 300 p.3d 925, 935 (Colo. App. 2012). Mr. Lawhon may recover damages for medical treatment that is reasonable and necessary. *Banning v. Prester*, 317 P.3d 1284, 1289 (Colo. App. 2012) (citing *Lawson v. Safeway, Inc.* 878 P.2d 127, 130-31 (Colo. App. 1994)).

7

## A. Economic Losses

With respect to economic losses, Mr. Lawhon seeks to recover for the destruction of the motorcycle, and the medical expenses arising out of the emergency room visit to University Hospital and physical therapy appointments. Mr. Lawhon is not seeking any reimbursement for lost wages.

### 1. Loss of the Motorcycle.

The motorcycle was damaged in the crash and was left at the scene when Mr. Lawhon was transported to the hospital. The motorcycle was then impounded and Mr. Lawhon lacked the funds to retrieve it from the impound lot. For our purposes, the motorcycle was a complete loss. The United States argues that Mr. Lawhon is not entitled to recover for the loss of motorcycle because the title to the motorcycle was not in Mr. Lawhon's name. However, the only evidence on the issue of ownership of the motorcycle was presented by Mr. Lawhon. Specifically, Mr. Lawhon testified that he entered into an agreement with the owner of the motorcycle, Tyrra Bohannon, pursuant to which Mr. Lawhon would get formal title to the motorcycle when he fulfilled certain obligations. Pl's Ex. 5. Mr. Lawhon was given possession of the motorcycle and Mr. Lawhon testified that he had fulfilled at least part of his obligations. Mr. Lawhon expended his labor and money to get the motorcycle running. The contract document Mr. Lawhon signed, Plaintiff's Exh. 5, titled "Secured Promissory Note," was executed and notarized on May 11, 2016, well before the accident and the destruction of the motorcycle. There is no suggestion that the agreement was fraudulent. Had the United States wanted to disprove Mr. Lawhon's testimony, or established that someone other

8

than Mr. Lawhon owned the motorcycle, it could have subpoenaed the party who entered into the contract with Mr. Lawhon.

Accordingly, I find that Mr. Lawhon established by a preponderance of the evidence that he had an ownership interest in the motorcycle sufficient to allow him to be compensated for its destruction. I find that $1,200 is a reasonable amount to compensate for the loss of the motorcycle. The motorcycle was valued at $1,200 in the Secured Promissory Note and Mr. Lawhon spent his time and energy to get it running and had spent $250 on new motorcycle tires.

### 2. Physical Therapy Expenses

The physical therapist who treated Mr. Lawhon, Ms. Gonzalez, testified credibly in detail about the course of treatment for Mr. Lawhon's injured ankle. I find the $1,269 in charges for physical therapy was a reasonable and necessary expense.

### 3. University Hospital Expenses

The parties agree that Mr. Lawhon was not, and cannot be in the future, personally liable to University Hospital for any amount because Colorado law provides that individuals covered by Medicaid "shall not be liable" for the "costs or costs remaining" after payment, regardless of whether the provider was paid. Colo. Rev. Stat. § 25.5-4-301(1)(a)(I) and (1)(a)(II). The parties disagree, and there was not sufficient evidence to make a determination as to as to whether Medicaid was ever billed for medical services provided by University Hospital immediately after the accident. What we do know is that Mr. Lawhon was provided medical services at University Hospital in the immediate aftermath of the accident, the reasonable value of which was $28,765.53 cents. *See* Plaintiff's Exh. 4 at 2-3 (itemization of hospital services).

Mr. Lawhon concedes that it is unknown whether University Hospital was able to collect any amount, but testified that he was contacted by University Hospital about paying the outstanding balance. He contends that whether any amount was actually paid to University Hospital is irrelevant because Medicaid benefits are a collateral source that cannot be used as a set off under Colorado law. Mr. Lawhon cited *Pressey by & through Pressey v. Children's Hosp. Colo.*, 2017 COA 28, 2017 WL 929931, ¶ 12 (Sept. 8, 2017) *cert. dismissed*, where the court held "Medicaid benefits to be an exception to the collateral source statute that ought not inure to the benefit of the tortfeasor."[1]

The United States disputes that the collateral source rule applies, and asserts, without citing any applicable authority to support its argument, that because University Hospital never billed Mr. Lawhon or Medicaid, the claim for economic damages would belong to University Hospital, not Mr. Lawhon. The Court rejects this argument for several reasons. First, it was not established that Medicaid was never billed. Second, even if Medicaid was never billed, it was a decision made by University Hospital based on Mr. Lawhon's Medicaid coverage, which, for the reasons outlined below, does not operate to bar Mr. Lawhon's recovery for the University Hospital Medical expenses under the contract exception to Colorado's collateral source rule.

---

[1] The *Pressey* decision declined to follow a prior Colorado Court of Appeals decision, *Gomez v. Black*, 511 P.2d 531 (Colo. App. 1973) which had held that the collateral source rule <u>does not</u> apply to gratuitous benefits received by plaintiffs from governmental sources. In other words, in *Gomez*, the court of appeals held that without a government department having assigned its right to recover expenses its beneficiaries might incur, or without joining in the action against the wrongdoer, an injured plaintiff could not recover the expenditures on his own behalf or on behalf of the state entity. 511 P.2d at 336.

In Colorado, the collateral source rule has two parts: (1) a pre-verdict evidentiary component, codified at Colo. Rev. Stat. § 10-1-135(10)(a); and (2) a post-verdict setoff rule, codified at Colo. Rev. Stat § 13-21-111.6. *See Sunahara v. State Farm Mut. Auto. Ins. Co.*, 280 P.3d 649, 654 (Colo. 2012). Here, the application of the post-verdict setoff rule is at issue:

> In any action by any person or his legal representative to recover damages for a tort resulting in death or injury to person or property, the court, after the finder of fact has returned its verdict stating the amount of damages to be awarded, shall reduce the amount of the verdict by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund in relation to the injury, damage, or death sustained; *except that the verdict shall not be reduced by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person*. The court shall enter judgment on such reduced amount.

Colo. Rev. Stat. § 13-21-111.6 (emphasis added). The post-verdict setoff rule reflects Colorado's common law collateral source rule to the extent that it prohibits "trial courts from reducing a plaintiff's verdict by the amount of indemnification or compensation that the plaintiff has received, or will receive in the future, from 'a benefit paid as a result of a contract entered into and paid for by or on behalf of' the plaintiff." *Wal-Mart Stores, Inc. v. Crossgrove*, 276 P.3d 562, 566 (Colo. 2012) (quoting § 13–21–111.6 and citing *Van Waters & Rogers, Inc. v. Keelen*, 840 P.2d 1070, 78–79 (Colo. 1992)).

In *Pressey*, the Colorado Court of Appeals held that Medicaid benefits fall under the contract exception to the collateral source statute in pre-verdict and post-verdict proceedings. 2017 COA 28 at ¶¶ 13 & 14. The court rejected the defendant's argument that Medicaid is a "gratuitous government benefit," and not a collateral source, noting

that the injured party was required to "enter into a Medicaid application agreement to repay the state for any Medicaid benefits she receives for which she would not qualify under federal guidelines." *Id.* at ¶14. Thus, the court found that Medicaid benefits fall under the contract exception to the collateral source rule. *Id.*

The court in *Pressey* noted that the Colorado Court of Appeals had already held that evidence of Medicaid benefits was properly excluded as evidence during trial that might cause the fact finder to improperly reduce a plaintiff's award of damages. *Id.,* (citing *Smith v. Kinningham*, 328 P.3d 258, 262 (Colo. App. 2013)). In the *Smith* case, the court cited cases from "numerous other jurisdictions" to support its conclusion, including *Montgomery Ward & Co. v. Anderson*, in which the Supreme Court of Arkansas chose "to adopt the rule that gratuitous or discounted medical services are a collateral source not to be considered in assessing the damages due a personal-injury plaintiff." 976 S.W.2d 382, 385 (Ark. 1998). The court in *Montgomery Ward* cited the Restatement (Second) of Torts § 920A to support its conclusion and noted that comments in that section provide "an example of a doctor who does not charge for medical services." *Id.*

The Colorado Supreme Court quoted the same section of the Restatement:

> a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. *If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.*

12

*Van Waters*, 840 P.2d at 1075 (quoting Restatement (Second) of Torts § 920A cmt. b (1979)) (emphasis added). *See also Volunteers of Am. Colo. Branch v. Gardenswartz*, 242 P.3d 1080, 1083 (Colo. 2010) (noting, with respect to the common law collateral source rule, "[a[ny third-party benefits or gifts obtained by the injured plaintiff accrue solely to the plaintiff's benefit and are not deducted from the amount of the tortfeasor's liability.).

The United States also argues that medical expenses paid by Medicaid do not fall under the contract exception because Medicaid is not a source "wholly independent" of the federal government. However, the cases cited by the United States either support Mr. Lawhon's position or are distinguishable in material ways. First, the United States cites *Austin v. United States*, 16-cv-02756-KLM, Dkt. #74, November 26, 2018, an unpublished opinion in which a fellow magistrate judge in this district found that payments made by TRICARE, a managed health care program that provides civilian health benefits for military personnel and their families, must be used to offset against any award to the plaintiff, who was a United States Air Force retiree. The court in *Austin* found that TRICARE is not a collateral source because it is not "wholly independent" of the tortfeasor, who, in that case, was the United States. *Id.* at 9. The court in *Austin* relied on the reasoning of the Colorado Supreme Court in *Colorado Permanente Medical Group, P.C. v. Evans*, 926 1218, 1232 (Colo. 1996), which stated that the policy of the collateral source rule is that a defendant should not be excused from paying a portion of the award by way of an offset from a collateral source. *Id.* at 13. The court in *Austin* also found that TRICARE benefits "materially differ" from Medicaid benefits,

13

noting that Medicaid had been found to fall within the contract exception to the collateral source statute by the Colorado Court of Appeals in the *Pressey* case. *Id.*

The Court is persuaded by the reasoning of *Smith v. United States of America*, 2018 WL 5816653 (D. Or. November 6, 2018) (applying Oregon's collateral source rule) (appeal pending). In *Smith v. United States*, the court rejected arguments similar to those made by the United States here, concluding that "even though the Defendant in this case is the federal government, the write-off is a collateral source because the benefit does not come from the Defendant, but instead from the state and the medical providers." *Id.* at *5.

The parties presented, and the Court found no Colorado appellate cases that explicitly address this precise issue of whether medical services not billed to or paid by Medicaid fall under the contract exception to Colorado's collateral source rule. As such, I am duty bound to predict how the Colorado Supreme Court would decide this issue. *See Jordan v. Maxim Healthcare Servs., Inc.*, No. 15-CV-01372-KMT, 2017 WL 4407939, at *4 (D. Colo. May 9, 2017)("This Court may, and normally has a duty to, predict how the Colorado Supreme Court would resolve this state law interpretation issue.") (*citing Vanover v. Cook*, 260 F.3d 1182, 1186 (10th Cir. 2001) ("In the absence of definitive direction from the highest court of the state . . . we must predict the course that body would take if confronted with the issue.")).

Considering the Colorado authority discussed above, I conclude an award to Mr. Lawhon of economic damages in the amount of $28,765.53 as reasonable and necessary medical expenses is appropriate. The touchstone guiding principal of

Colorado law relating to the collateral source rule is that if there is a windfall, it should go the injured party, not to the tortfeasor:

> The rule's purpose is to prevent a tortfeasor from benefitting, in the form of reduced liability, from compensation in the form of money or services that the victim may receive from a third-party source. *See Quinones v. Pa. Gen. Ins. Co.*, 804 F.2d 1167, 1171 (10th Cir. 1986). ("The rule evolved around the commonsense notion that a tortfeasor ought not be excused because the victim was compensated by another source, often by insurance."). Accordingly, the rule is somewhat punitive in nature. It prohibits the wrong-doer from enjoying the benefits procured by the injured plaintiff. If either party is to receive a windfall, the rule awards it to the injured plaintiff who was wise enough or fortunate enough to secure compensation from an independent source, and not to the tortfeasor, who has done nothing to provide the compensation and seeks only to take advantage of third-party benefits obtained by the plaintiff. *See Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1074 (Colo.1992) ("To the extent that either party received a windfall, it was considered more just that the benefit be realized by the plaintiff in the form of double recovery rather than by the tortfeasor in the form of reduced liability.").
>
> Double recovery is permitted to an injured plaintiff because the plaintiff "should be made whole by the tortfeasor, not by a combination of compensation from the tortfeasor and collateral sources. The wrongdoer cannot reap the benefit of a contract for which the wrongdoer paid no compensation." *Acuar v. Letourneau*, 260 Va. 180, 531 S.E.2d 316, 323 (2000) (emphasis added) (holding that, under the collateral source rule, tortfeasor may not reduce a plaintiff's award by the amounts written off by plaintiff's healthcare providers).

*Volunteers of America Colorado Branch v. Gardenswartz*, 242 P.3d 1080, 1083-84 (Colo. 2010). Using this principle of Colorado law as a guide, an award of damages to Mr. Lawhon for medical expenses incurred in treating his injuries from the motorcycle accident is appropriate.

The United States argued in closing that any award of damages for services gratuitously rendered to Mr. Lawhon would be punitive in nature, and as such cannot be awarded because the United States is not subject to punitive damages under the FTCA. However, under the FTCA, this Court is required to assess damages according to the

15

law of the state in which the tort occurred. *See* 28 U.S.C. § 1346(b). Punitive damages in Colorado are determined according to a statute and based on a standard entirely separate from the collateral source statute, which allows the award of written off medical expenses as economic damages. Colo. Rev. Stat. § 13-21-102. Accordingly, the Court finds that an award of damages for gratuitous, reasonable and necessary medical expenses here cannot be considered punitive damages that would be barred by the FTCA. *See, e.g. Smith,* 2018 WL 5816653 at *5 ("awarding the write-off amount in this case does not convert the award into an award of punitive damages).

I recognize that if a damages award under tort law is intended to make a plaintiff whole for the damages or losses that he has incurred, it is somewhat counter-intuitive to allow Mr. Lawhon to recover as "damages" the value of medical services that he received for free from University Hospital, for which he incurred no liability, and that he did not "lose" in any meaningful way. I also recognize that under a different state's law this result might be different. But Colorado law treats Medicaid payments as a collateral source not to be considered in calculating a damages award. And University Hospital's decision to not bill or collect from Medicaid is not a decision that the tortfeasor is entitled to benefit from. "[M]aking the injured plaintiff whole is solely the tortfeasor's responsibility. Any third-party benefits or gifts obtained by the injured plaintiff accrue solely to the plaintiff's benefit and are not deducted from the amount of the tortfeasor's liability. These third-party sources are 'collateral' and are irrelevant in fixing the amount of the tortfeasor's liability." *Volunteers of America*, 242 P.3d at 1082-83. Colorado's version of the collateral source rule therefore allows "double recovery by a successful plaintiff." *Id.* Mr. Lawhon fits this category.

B.  **Non-Economic Losses**

Mr. Lawhon seeks damages for physical and mental pain and suffering, inconvenience, emotional stress, impairment of the quality of life, and physical impairment. Fortunately for Mr. Lawhon, his injuries were not permanent. However, Mr. Lawhon established by a preponderance of the evidence that he was sore in the days following the accident, that he went for physical therapy as a result of pain and swelling in his ankle, and that he continues to have a "popping" sensation and residual pain in that ankle. Mr. Lawhon also testified about the stress in the days and weeks following the accident that prevented him from working and providing for his family. Mr. Lawhon asked for $96,000 to compensate him for his noneconomic damages. However, given that Mr. Lawhon's injuries were not severe, and that he was eventually able to engage in typical life activities after the accident, I find an award of $10,000 for his non-economic losses (pain and suffering resulting from having run into the side of a passenger van at 20 mph), and $5,000 for his physical impairment (on-going soreness and problems with his ankle), to be appropriate.

III. **CONCLUSION**

Based on the foregoing, it is hereby ORDERED that judgment in favor of Plaintiff be entered against Defendant in the amount of $46,234.53, calculated as follows:

Motorcycle: $1,200.00

Physical Therapy: $1,269.00

UC Hospital: $28,765.53

Pain and Suffering: $10,000.00

Impairment: $5,000.00

Total: $46,234.53.

Plaintiff shall also be awarded his litigation costs, to be taxed by the clerk.

Dated: August 30, 2019

BY THE COURT

_____
N. Reid Neureiter
United States Magistrate Judge